622 A.2d 1279

JOANN CAREY, INDIVIDUALLY; GREGORY CAREY, INDIVIDU-
ALLY; JOANN CAREY AND GREGORY CAREY, AS GENERAL
ADMINISTRATORS AND ADMINISTRATORS AD PROSE-
QUENDUM FOR THE ESTATE OF AMANDA CAREY, DE-
CEASED; ANNETTE CAREY, INDIVIDUALLY; AND GREGO-
RY CAREY, AS HUSBAND OF JOANN CAREY, PLAINTIFFS–
APPELLANTS, v. WILLIAM E. LOVETT, JR., M.D.; JOHN H.
OSLER III, M.D., P.A.; AND JOHN H. OSLER III, M.D., DEFEN-
DANTS–RESPONDENTS, AND ROBERT H. GERARD, M.D.;
MEENA PATHIKONDA, M.D.; JOHN DOE (UNKNOWN PHYSI-
CIAN OR PHYSICIANS UNDER WHOSE CONTROL THE
PLAINTIFF JOANN CAREY WAS ON OCTOBER 11, 1983);

WEST JERSEY HEALTH SYSTEMS, A/K/A WEST JERSEY HOSPITAL—EASTERN DIVISION, VOORHEES, NEW JERSEY; BARRY BROWN, PRESIDENT OF WEST JERSEY HOSPITAL SYSTEMS; THOMAS L. SCOTT, EXECUTIVE DIRECTOR OF WEST JERSEY HOSPITAL SYSTEMS—EASTERN DIVISION; THEODORE J. DECONNA, M.D., CHAIRMAN OF O.B./GYN DEPARTMENT OF WEST JERSEY HOSPITAL—EASTERN DIVISION; JOHN A. MARCHESANI, M.D., CHAIRMAN, PEDIATRIC DEPARTMENT OF WEST JERSEY HOSPITAL SYSTEMS—EASTERN DIVISION; JANE DOE (UNKNOWN DIRECTOR OF NURSES OF WEST JERSEY HOSPITAL, EASTERN DIVISION); THERESA LYLE, ASSISTANT DIRECTOR OF NURSES OF WEST JERSEY HOSPITAL—EASTERN DIVISION; THOMAN, R.N.; SOFIA ROACHE, R.N.; MARJORIE LEVINS, L.P.N.; S. COLLINS, R.N.; L. COLLINS, A/K/A (L); LILLIAN LIMIEDOR, R.N., A/K/A (L); MARY LOUISE HACH, R.N.; MARIA GREEN, L.P.G.; JOANN CARTER, R.N.; BARBARA GREEN, R.N.; JUDY WITT, R.N.; P. CARNUCCIO, L.P.N.; NURSE DOE (AN UNKNOWN NURSE OR NURSES UNDER WHOSE CARE JOANN CAREY WAS ON OCTOBER 11, 1983); JOHN DOE (WITH RESPECT TO THE FETAL MONITORING DEVICE OR DEVICES USED ON JOANN CAREY ON OCTOBER 11, 1983, JOHN DOE(S) IS A FICTITIOUS UNKNOWN MANUFACTURER, WHOLESALER, DISTRIBUTOR, RETAILER, SUPPLIER OF COMPONENT PARTS, DESIGNER, MAINTENANCE COMPANY, AND/OR A SUCCESSOR ENTITY OF ANY ONE OR MORE OF THE AFOREDESCRIBED); JOHN DOE(S) (EMPLOYEE OF WEST JERSEY HOSPITAL IN CHARGE OF SAID FETAL MONITORING DEVICE(S)), DEFENDANTS.

Argued September 14, 1992—Decided April 6, 1993.

46

48

*Vincent J. Ciecka* argued the cause for appellants (*Mr. Ciecka,* attorney; *Mr. Ciecka* and *Janice Venables,* on the briefs).

*Stanley P. Stahl* argued the cause for respondent William E. Lovett, Jr., M.D. (*Mr. Stahl,* attorney; *Mr. Stahl* and *Sharon K. Galpern,* on the brief).

*Joel B. Korin* argued the cause for respondents John H. Osler, III, M.D., P.A. and John H. Osler, M.D. (*George & Korin,* attorneys; *Mr. Korin* and *Dale Verfaillie Chant,* on the brief).

*Samuel Merovitz, Jeffry A. Mintz,* and *Janet Law* submitted a brief on behalf of *amicus curiae* Association of Trial Lawyers of America–New Jersey (*Mintz & Merovitz,* attorneys).

*David S. Stone* submitted a brief on behalf of *amicus curiae* Medical Society of New Jersey (*Stern & Greenberg,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

Once again we are summoned to respond to a family tort arising from an alleged act of medical malpractice. The case arises in the inflammatory setting of the tragic loss of a baby due to physician neglect. The issue is whether parents can recover for their emotional distress caused by medical malpractice in the birth and death of their daughter.

Relying on *Giardina v. Bennett,* 111 *N.J.* 412, 545 *A.*2d 139 (1988), the Law Division ruled that the parents, plaintiffs JoAnn Carey and Gregory Carey, could assert a direct claim for their emotional distress. The jury awarded $1,000,000 to the mother and $500,000 to the father, as well as $550,000 to their daughter's estate for her pain and suffering and $450,000 for her wrongful death.

In an unreported opinion, the Appellate Division reversed. It found that the trial court should have considered the parents' claim for emotional distress not as a direct claim under *Giardina* but as an indirect claim under *Frame v. Kothari,* 115 *N.J.* 638, 560 *A.*2d 675 (1989). Finding that the facts did not support a cause of action under *Frame,* the Appellate Division dismissed the parents' emotional-distress claim. The court also set aside the pain-and-suffering and wrongful-death awards as excessive, and remanded the matter to the Law Division for a new trial on both liability and damages. We granted the Careys' petition for certification, 127 *N.J.* 553, 606 *A.*2d 366 (1991), and now affirm in part, reverse in part, and remand the matter for a trial on all issues. We hold that a jury could find for Mr. and Mrs. Carey on their claims for emotional distress.

## I

During the summer of 1983, plaintiff JoAnn Carey, who suffers from diabetes mellitus type I, became pregnant for the third time in four years. Her treating physicians were defendant doctors John H. Osler III, an internist, and William E. Lovett, Jr., an obstetrician and gynecologist, both of whom had managed Mrs. Carey's first two pregnancies. Dr. Osler had also treated Mrs. Carey for her diabetes, including two incidents of diabetic ketoacidosis, a dangerous increase in body acid. Dr. Lovett had been Mrs. Carey's gynecologist since the early 1970s. In October 1980 he had delivered her first child, Annette, who was one-month premature and suffered from toxemia, but was otherwise healthy. Mrs. Carey's second pregnancy ended in a miscarriage in March 1983. After the events that are the subject of this action, Mrs. Carey gave birth to another daughter, who was born one-month prematurely but in good health.

On October 9, 1983, in the twenty-sixth week of her third pregnancy, Mrs. Carey awoke feeling tired and short of breath. She tested her blood sugar, which was elevated. Attempting to lower her blood sugar, she increased her dosage of insulin and drank bouillon throughout the day. Her efforts were unsuccessful, and at 8:30 the next morning, Mrs. Carey, still feeling ill, called Dr. Osler.

Dr. Osler's answering service received Mrs. Carey's call, and at 9:00 a.m. his receptionist phoned her. Mrs. Carey reported her symptoms to the receptionist, who told her that Dr. Osler would call. During the day, Mrs. Carey called Dr. Osler's office several times, but she did not hear from him until ten o'clock that night. Dr. Osler testified that he had attempted unsuccessfully to call Mrs. Carey during the day.

Mrs. Carey's and Dr. Osler's accounts of the 10:00 p.m. telephone call differ. Dr. Osler claims that he had told Mrs. Carey to go to the hospital immediately, but that she had refused. Mrs. Carey asserts that he had told her to report to

the hospital the next morning, October 11. After the telephone call, Dr. Osler arranged for Mrs. Carey's admission, under Dr. Lovett's care, to West Jersey Hospital the next day. Dr. Osler testified that during that evening he had also telephoned Dr. Lovett's answering service and had left a message about Mrs. Carey's imminent admission. Dr. Lovett testified, however, that he had received no such message.

On the morning of October 11, someone from West Jersey Hospital called Mrs. Carey and told her to report to the hospital in the early afternoon. Mrs. Carey was admitted at 1:00 p.m. Her admission records indicate a diagnosis of "uncontrolled diabetes, six months pregnant." At 2:30 p.m., Dr. Robert Gerard, an internist who was covering for Dr. Osler, examined Mrs. Carey. Dr. Gerard diagnosed Mrs. Carey as suffering from an attack of ketoacidosis, which, in a diabetic woman, frequently causes intrauterine death.

Dr. Gerard also noted that Mrs. Carey was experiencing intermittent contractions. He listened for fetal heart sounds, but could find none. After a routine exam one week earlier, on October 3, Dr. Lovett had told Mrs. Carey that the baby's heartbeat was strong and that she was "over the hump" as far as the most dangerous complications of a diabetic pregnancy were concerned.

At 3:00 p.m., the hospital called Dr. Lovett to inform him that Dr. Gerard had examined Mrs. Carey, had found her to be experiencing diabetic ketoacidosis, and had not detected any fetal heart tones. Based on that telephone call, Dr. Lovett made a tentative diagnosis of fetal demise.

One-half hour later, Mrs. Carey was experiencing strong contractions. Hospital personnel transferred her to the labor and delivery floor of the hospital and notified Dr. Lovett. Nurse Lillian Lovenduski phoned Lynn Collins, the senior labor and delivery nurse, to tell her to expect Mrs. Carey. No one attempted to arrest Mrs. Carey's labor. By 4:30 p.m., Mrs. Carey's contractions were two to three minutes apart.

Between 4:30 and 5:00 p.m., nurses Sofia Roache and Marjorie Levins attempted to find a fetal heart sound. They used a transducer, a device that converts physical impulses such as sound into electronic signals for a fetal monitoring system. They then used a doppler, an electronically-amplified stethoscope. All attempts were unsuccessful. Nurse Collins was summoned, but she too was unable to locate a fetal heart sound. At 5:00 p.m., the nurses telephoned Mr. Carey and Dr. Lovett and told them that Mrs. Carey was going into labor. Dr. Lovett advised the nurses to allow Mrs. Carey to deliver the expected stillborn child. He ordered injections of Demerol and Vistaril to relieve Mrs. Carey's pain.

At approximately 5:30 p.m., Gregory Carey arrived at the hospital and went to the labor room. Nurse Collins informed the Careys that there were no audible fetal heart tones and that the fetus was dead. Mrs. Carey insisted that the fetus was alive and that she could feel it moving. At Mr. Carey's request, nurse Collins again tested for a fetal heart tone, using both the transducer and the doppler. She also allowed Mr. and Mrs. Carey to listen to the negative results. Mrs. Carey again refused to accept that the fetus was dead. The nurses did not use other available and more accurate methods of determining fetal viability, such as ultrasound or x-rays.

A nurse then escorted Mr. Carey from the labor room and asked him to convince Mrs. Carey that the fetus was dead. The nurse explained that Mrs. Carey's denial of the baby's death was natural, but that he should try to calm his wife by telling her to listen to the nurses. Mr. Carey complied with the nurse's request. Mrs. Carey tearfully maintained that her baby was alive. The nurses did not perform any other test to confirm the diagnosis that the baby was dead.

Dr. Lovett, whom hospital personnel had called periodically, had not come to the hospital during Mrs. Carey's labor. The hospital records indicate that at approximately 7:45 p.m., someone injected Mrs. Carey with Pitocin, a drug that increases

contractions and induces delivery. No one, however, admits authorizing or giving the injection. Between 8:30 p.m. and 9:00 p.m., Mrs. Carey's contractions grew stronger. According to Mr. Carey, an unidentified nurse broke Mrs. Carey's water to speed delivery. The nurses dispute that assertion.

At 9:06 p.m., eight hours after being admitted to the hospital, Mrs. Carey delivered a baby in a breech position. Neither nurse Collins nor nurse Levins, the only hospital personnel present at the birth, assisted in the delivery. The baby dropped unsupported onto the labor bed. Nurse Collins cut the umbilical cord and announced that the baby was a girl. Nurse Levins asked Mrs. Carey if she wished to hold the baby. On his wife's behalf, Mr. Carey declined. Like the nurses and the doctors, he believed that the baby was dead.

The baby was alive. Her color at birth was pink, not the blue, black, or purple expected for a stillborn baby. Nurse Levins took the baby from the room. Mr. Carey, still believing the baby was dead but wondering why she looked healthy, requested that a doctor examine her to determine the cause of death. Assuring Mr. Carey that a doctor would look at the baby, nurse Levins, now joined by nurse Roache, took the baby into another room and closed the door. Still, no one realized or suspected that the baby was alive.

When placed on the weighing scale, however, the baby gasped for air. Nurse Collins palpated the baby's umbilical stump and was able to detect a fetal heart beat. Nurse Levins rushed the infant to the neonatal nursery.

While Mr. Carey was walking back to the labor room, nurse Levins told him that the child was alive. The baby, she added, was very sick and would soon die. She advised Mr. Carey not to tell his wife that the baby was alive, because he would soon thereafter have to tell her that the child had died. Mr. Carey returned to the labor room to be with his wife. He did not tell her their child was alive.

The staff obstetrician, Dr. Meena Pathikonda, came to Mrs. Carey's room to help Mrs. Carey deliver the placenta. After the delivery, hospital personnel moved Mrs. Carey to a recovery room. Finally, Dr. Lovett arrived. He informed Mrs. Carey that the baby was alive but very sick and that they should all pray for her. The Careys were happy and relieved that their baby, later named Amanda, was alive.

Dr. Andrew Costarino, Jr., a perinatologist and neonatologist, who testified both as a treating physician and as an expert witness for plaintiffs, estimated that three minutes had passed between the baby's birth and the call summoning him to the nursery. When he arrived, the baby was limp and blue. He could not hear any heartbeat. While preparing to place a tube in the baby's windpipe, Dr. Costarino noticed that her vocal chords moved, indicating that she was still alive. After he inserted the tube and connected it to a resuscitator, the baby's color rapidly returned to pink, and Dr. Costarino detected her heart tone. Through a catheter placed in the umbilical-cord stump, Dr. Costarino administered calcium, glucose, and bicarbonate. He also administered a drug to counteract the effects of the Demerol and Vistaril that had been given to Mrs. Carey. The baby was then placed on a mechanical ventilator and given antibiotics. That night she was transferred from West Jersey to Children's Hospital in Philadelphia.

On October 13, the doctors at Children's Hospital discovered that the baby was hemorrhaging from both sides of her brain. They told Mr. Carey that the child was severely brain damaged and would not live much longer. Mr. Carey reported this to his wife, who was still hospitalized in West Jersey.

On October 21, Amanda was still alive. Her doctors, however, gave her no chance of improvement. She was profoundly damaged and in a vegetative state. After consulting with the doctors at Children's Hospital, the Careys decided to disconnect their daughter from life-support machines. That day, Amanda died in her mother's arms.

The Careys, individually and as general administrators and administrators *ad prosequendum*, sued Drs. Lovett and Osler, certain other physicians, as well as various nurses, hospital administrators, and the manufacturers of the fetal monitors. Before and during the trial, the court granted motions to dismiss some defendants, and the jury returned a verdict of no cause for action against others. The jury returned a verdict against Drs. Lovett and Osler, imposing eighty per cent responsibility on Dr. Lovett and twenty per cent on Dr. Osler. Thereafter, the court denied defendants' motions for judgment notwithstanding the verdict, a new trial, or remittitur.

## II

This case poses the question whether parents, without attempting to prove any physical injury to themselves, may recover for their emotional distress caused by medical malpractice resulting in the premature birth and death of their baby. They rely on those cases in which we have recognized a direct duty extending to parents that permits them to maintain a claim for emotional distress. For example, in a "wrongful birth" case, we have allowed parents to recover for their emotional distress caused by the negligent failure of physicians to advise the mother of the availability of amniocentesis, thereby depriving her of the right to choose to abort a fetus afflicted with Down's Syndrome. *See Berman v. Allan*, 80 *N.J.* 421, 404 *A.*2d 8 (1979). We also have acknowledged a parental right to recover for emotional distress when medical malpractice resulted in the stillbirth of a baby. See *Giardina, supra,* 111 *N.J.* at 415, 545 *A.*2d 139. Similarly, we have recognized the right of parents to recover for their emotional distress from the failure of a hospital to release their son's corpse after he was brain dead. See *Strachan v. John F. Kennedy Memorial Hosp.*, 109 *N.J.* 523, 538, 538 *A.*2d 346 (1988).

A separate line of cases permits "bystanders" to recover for their emotional distress resulting from injury to another. The

progression in this line of cases has been from denying recovery for "indirect" injuries in all circumstances, see *Graf v. Taggert*, 43 *N.J.* 303, 309, 204 *A.*2d 140 (1964), to finding "a sufficient guarantee of genuineness, even in the absence of physical injury, if the plaintiff perceives an injury to another at the scene of the accident, the plaintiff and the victim are members of the same family, and the emotional distress is severe," *Buckley v. Trenton Saving Fund Soc'y*, 111 *N.J.* 355, 365, 544 *A.*2d 857 (1988) (citing *Portee v. Jaffee*, 84 *N.J.* 88, 93, 417 *A.*2d 521 (1980)). *See also Green v. Bittner*, 85 *N.J.* 1, 4, 424 *A.*2d 210 (1980) (limiting parents of teen-age daughter negligently killed to recovery under Wrongful Death Act, *N.J.S.A.* 2A:31–1 to –6, which does not allow recovery for emotional loss).

Of particular relevance, we have held that under limited circumstances the medical misdiagnosis of one member of a family may entitle another member to recover for his or her own emotional distress. *See Frame, supra*, 115 *N.J.* 638, 560 *A.*2d 675. Recognizing that the death or serious injury of a family member may often produce emotional distress, sometimes quite severe, in another member, we limited recovery to the "observation of shocking events that do not occur in the daily lives of most people." *Id.* at 644, 560 *A.*2d 675. In so limiting recovery, we recognized that although a "misdiagnosis may lead to tragic consequences," "[t]he nature of a misdiagnosis is such that its results may neither manifest themselves immediately nor be shocking." *Ibid.* Our endeavor has been to balance recognition of psychic injury with concerns for "speculative results or punitive liability," *Portee, supra*, 84 *N.J.* at 97, 417 *A.*2d 521, and for the genuineness of the claim, *Buckley, supra*, 111 *N.J.* at 365, 544 *A.*2d 857.

The characterization of a claim as "indirect" and of the claimant as a "bystander" restricts the class of claimants who may recover for emotional distress. Originally, no claims for emotional distress were compensable unless accompanied by physical impact. *See Eyrich for Eyrich v. Dam*, 193 *N.J.Su-*

*per.* 244, 252, 473 *A.*2d 539 (App.Div.), *certif. denied,* 97 *N.J.* 583, 483 *A.*2d 127 (1984); *Ward v. West Jersey & Seashore R.R.,* 65 *N.J.L.* 383, 47 *A.* 561 (Sup.Ct.1900). Later cases allowed recovery for emotional distress in the absence of physical impact, if the distress resulted in physical injury. See *Falzone v. Busch,* 45 *N.J.* 559, 569, 214 *A.*2d 12 (1965). In *Portee, supra,* 84 *N.J.* at 101, 417 *A.*2d 521, in which we first articulated the difference between direct and indirect claims, we allowed recovery in the absence of resulting physical injury. We held that a mother who had observed at the scene of an accident an egregious injury to her son could recover for her emotional distress if it was severe.

In *Giardina,* which recognized a parental claim for emotional distress arising out of the stillbirth of a baby, we concluded that "the experience of pregnancy and child birth itself constitutes the immediacy and presence of the claimant in the face of inflicted personal injury or death of a loved one that was stressed in *Portee.*" 111 *N.J.* at 419–20, 545 *A.*2d 139. We further concluded that the "circumstances assure the genuineness of the resulting emotional injury and mental anguish." *Id.* at 420, 545 *A.*2d 139. Those conclusions led to the characterization of the parents' medical malpractice claim as "direct," *id.* at 413, 545 *A.*2d 139, a characterization that was itself more a conclusion than a prerequisite for recovery.

The characterization of a claim as "direct" or "indirect," although useful for distinguishing claims in which the source of the emotional distress is an injury to the claimant from those in which the injury is to another, should not predetermine the rights of the parties. More important than the characterizations are the principles underlying them.

In the law of negligence, including that pertaining to family torts, the scope of a duty depends generally on the foreseeability of the consequences of a negligent act, as limited by policy considerations and concerns for fairness. *Schroeder v. Perkel,* 87 *N.J.* 53, 63, 432 *A.*2d 834 (1981) (citing *Portee, supra,* 84 *N.J.*

at 94–96, 417 *A*.2d 521). Accordingly, we have recognized that the injury to one family member may cause another member to suffer. *See Giardina, supra,* 111 *N.J.* at 412, 545 *A*.2d 139; *Strachan, supra,* 109 *N.J.* at 523, 538 *A*.2d 346; *Schroeder, supra,* 87 *N.J.* at 53, 432 *A*.2d 834; *Berman, supra,* 80 *N.J.* at 421, 404 *A*.2d 8. Concerns about the genuineness of indirect claims for emotional distress have led to limitations on the right to recover to situations in which the distress is severe or is accompanied by physical injury. Additional concerns about speculative results or punitive liability have led us to limit such claims to the observation of shocking events. With medical-malpractice claims, we have required that claimants observe contemporaneously the act of malpractice and the resultant injury.

The present case involves parental claims for emotional distress caused by malpractice on the mother and the fetus during childbirth. Any time a doctor negligently injures a child it is foreseeable that the parents will suffer emotional distress. Indeed, parents will likely suffer anytime anyone injures their child. As we recognized in *Portee,* "the death or serious injury of an intimate family member will always be expected to threaten one's emotional welfare." 84 *N.J.* at 99, 417 *A*.2d 521. Although such emotional distress is real, even severe, *see Green, supra,* 85 *N.J.* at 13, 424 *A*.2d 210, we have allowed recovery only for "negligent conduct which strikes at the plaintiff's basic emotional security," *Portee, supra,* 84 *N.J.* at 99, 417 *A*.2d 521. Our concern is not only with the genuineness of emotional-distress claims and speculative damages but also with the effects of the expansion of liability on the medical profession and society. *See Frame, supra,* 115 *N.J.* at 649–50, 560 *A*.2d 675; *see also id.* at 651, 560 *A*.2d 675 (Wilentz, C.J., and Garibaldi, J., concurring) ("Expanding liability should entail the balancing of many interests: 'a weighing of the relationships of the parties, the nature of the risk, and public interest in the proposed solution.'" (quoting *Goldberg v. Housing Auth.,* 38 *N.J.* 578, 583, 186 *A*.2d 291 (1962))); John J. Smith, *Medical*

*Malpractice: Problems, Perspectives, and Solutions, in* II *Biolaw* S:1 (1993 ed.) ("Malpractice insurance premiums for all health care providers have risen from $60 million in 1960 to $7 billion in 1988; $5 billion of these premiums are paid by physicians. These premiums are a very substantial portion of the $105 billion directly spent on physicians' services in 1988.").

In some respects, a mother and her fetus are so interconnected that they may be considered as one. In other respects, they manifest separate identities. From either perspective, the mother is more than a "bystander." To this extent, an injury to the fetus could be viewed as supporting a direct parental claim for emotional distress, the view adopted by the Law Division. In disagreeing, the Appellate Division limited the direct claim of parents to the facts of *Giardina,* which involved a stillborn infant.

Our analysis begins by recognizing that the physical and emotional ties between mother and fetus so unite them that a physician should anticipate that any malpractice that adversely affects the fetus will cause emotional distress to the mother. Unlike parents who have time to adjust between an act of malpractice on their child and a resultant injury, the expectant mother's distress is immediate. In effect, the connection between a mother and her baby so merges "direct" and "indirect" claims that the distinction disappears.

The unique relationship between a pregnant woman and her baby mitigates the need for the additional requirements of an "indirect claim" for emotional distress. Bound by physical and emotional ties, mother and baby are so closely joined that we need not require that the mother be "shocked" by malpractice on the baby. The maternal-fetal relationship bespeaks the genuineness of an otherwise-valid claim for emotional distress. To the extent that lack of preparation for the birth of a live, but impaired, child is relevant, it is subsumed in the requirement that the emotional distress be severe. That requirement provides a sufficient guaranty of genuineness to substitute for

physical injury to the claimant, which until now has been an element of a direct claim for emotional distress. *See Strachan, supra,* 109 *N.J.* at 538, 538 *A.*2d 346.

A further consideration counsels against requiring that the mother be contemporaneously aware of the malpractice and the injury to her fetus. A woman may choose not to be anesthetized because of her concern for the effect on her baby or because of her desire to participate consciously in the child's birth. A requirement of contemporaneous observation could disserve both objectives by providing physicians with an incentive to anesthetize the woman. *See Burgess v. Superior Court,* 2 *Cal.*4th 1064, 9 *Cal.Rptr.*2d 615, 831 *P.*2d 1197, 1203 (1992). To require that the mother be contemporaneously aware of the obstetrician's malpractice and the injury to the fetus is both unnecessary and unwise.

Similarly, a woman who has been told that her fetus is dead need not prove that she was subsequently shocked on learning that the child had been born alive but impaired, particularly when, as here, the child survives for ten days on a life-support system and then dies. In those circumstances, one need not worry whether the mother's distress is real. No useful purpose is served by requiring the mother to prove that she was "shocked" in the sense that she was unprepared for the result. See *Friel v. Vineland Obstetrical & Gynecological Professional Association,* 166 *N.J.Super.* 579, 582, 400 *A.*2d 147 (Law Div.1979) (recognizing claim of pregnant woman "for her fright, anxiety and shock sustained by the premature delivery and uncertainty as to the child's normality during the formative years of development to the stage where educational testing may be had").

A father's claim for emotional distress presents different considerations. No matter how intimately involved in the birth of his child the father may be, his role differs from that of the mother. In determining whether the mother's physician or obstetrician owes a duty to the father, we recognize the ab-

sence of a physician-patient relationship between the father and the doctors. The absence of such a relationship, however, does not necessarily preclude the existence of a duty extending from the physicians to the father.

Our decisions on "direct" and "indirect" claims for emotional distress shed light on the definition of Mr. Carey's claim. As with the mother's claim, the father's distress must be severe. The father, moreover, must stand in an intimate family relationship to the mother and baby. *Giardina,* 111 *N.J.* at 419, 545 *A.*2d 139 (citing *Strachan, supra,* 109 *N.J.* at 534, 538 *A.*2d 346; *Portee, supra,* 84 *N.J.* at 97, 417 *A.*2d 521; *Friel, supra,* 166 *N.J.Super.* at 587–92, 400 *A.*2d 147). To this extent, the fairness of extending the doctor's duty of reasonable care to the father is strengthened by the family ties between the victim and the father. *Giardina, supra,* 111 *N.J.* at 419, 545 *A.*2d 139. We anticipate that many fathers will satisfy that requirement. When the father is drawn sufficiently into the treatment of the mother and the baby, the physician's duty to him is like that owed to the mother. Cases may arise, however, in which the father's relationship lacks the intimacy to support a cause of action for injury to the fetus. Because of the inherent difference in the role of the father and mother we believe that the father's claim should be limited by the requirements pertaining to other forms of medical malpractice. Thus, the father must contemporaneously observe the malpractice and its effects on the victim. *Frame, supra,* 115 *N.J.* at 643, 560 *A.*2d 675. Finally, the injury to the victim should be "shocking" in the sense the father did not have time to prepare for the injury. *Id.* at 645, 560 *A.*2d 675.

The concurring opinion could be read as misconstruing the implications of our holding. Although the concurrence notes our conclusion that the principles underlying parental claims for emotional distress are more important than the characterization of those claims, *post* at 71, 622 *A.*2d at 1293, it does not refer to our statements that "the mother is more than a 'bystander,'" *ante* at 59, 622 *A.*2d at 1286, and that "the

connection between a mother and her baby so merges 'direct' and 'indirect' claims that the distinction disappears," *supra* at 59, 622 *A.*2d at 1286. Also absent from the concurrence is our recognition that "the absence of a physician-patient relationship between the father and the doctors ... does not necessarily preclude the existence of a duty extending from the physicians to the father." *Supra* at 61, 622 *A.*2d at 1287. Finally, the concurrence seems to treat as new the requirement that the parents' distress be genuine and severe. *Post* at 71–73, 622 *A.*2d at 1292–1293. That requirement serves as a substitute for the physical manifestation of injury, which until now has been a prerequisite for a direct claim for emotional distress. *Supra* at 60, 622 *A.*2d at 1287.

In sum, to prove a claim for emotional distress arising out of the injury or death of a fetus, the mother must prove that she suffered emotional distress so severe that it resulted in physical manifestations or that it destroyed her basic emotional security. The father's emotional distress must be equally severe. The worry and stress that attend the birth of every child will not suffice. Nor will the upset that every parent feels when something goes wrong in the delivery room. In addition, the father must contemporaneously observe the malpractice and its effects on the victim. He must also be shocked by the results.

In this case, the trial court did not charge the jury that it must find that the father had contemporaneously observed the act of malpractice and its effects. Nor did it charge that to sustain a compensable claim for emotional distress the father must be shocked. Although the record supports Mr. Carey's claim in both respects, the charge as to his claim was erroneous.

### III

A claim by a pregnant woman or her husband for emotional distress caused by alleged medical malpractice during childbirth can readily evoke an emotional response. Indeed, the volatility

of such claims underlies our circumspection in recognizing them. Precisely because of the power of such claims to play on the sympathies of others, trial courts must be sensitive to their obligation to remain impartial when adjudicating those claims.

After reviewing the record, the Appellate Division concluded that the trial court had lost its sense of impartiality. The Appellate Division wrote:

> Lovett's and Osler's briefs set forth details documenting their grievance that numerous inflammatory improper events and testimony tainted the jury and that the trial judge exhibited bias which prejudiced defendants. Because of the perception shared by both Lovett and Osler that the judge was acting out of personal bias, we have carefully examined the alleged instances of intemperate conduct in the trial transcript. Although it would serve no useful purpose to spread all the actual exchanges on the record, we note that there are numerous instances where the trial judge crossed the line and improperly interjected himself into the case. This interference could well have manifested itself in the shocking damage awards returned by the jury here. In any event, the judge's actions here may well have given counsel the impression that he was not acting with complete impartiality. "A judge ... should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Code of Judicial Conduct Canon 2A.

Our review of the record leads us to the same conclusion. As cold as the record may be for evaluating the dynamics of a trial, it reveals that the trial judge tilted impermissibly in favor of plaintiffs. A reading of the transcript reveals his constant intrusions into defense counsel's direct and cross-examination of witnesses. The harm from those intrusions was exacerbated by the court's numerous attempts, many unsolicited, to aid plaintiffs' counsel, a certified civil trial attorney, in his examination of witnesses.

The need for judicial restraint appeared early in the trial. The opening statement of plaintiff's counsel apparently left one juror weeping. Defense counsel objected to the opening as inflammatory and unsuccessfully moved for a mistrial. Later, according to defendants, plaintiffs' counsel was crying during the direct examination of Mr. Carey. Although the trial court recognized the emotional nature of the examination, it overruled a defense objection that counsel's conduct was inflaming the jury.

Throughout the five-week trial, the court constantly reprimanded defense counsel before the jury and chastised them at side bar. During the course of one rancorous exchange, the court admonished defense counsel, "This time you're going to get it. That goes on the record, too."

At another point, the court precluded Dr. Lovett from testifying as an expert on his own behalf, thereby restricting him from testifying as a fact witness. Although the court permitted Dr. Lovett to testify that he knew the standard of care applicable to obstetricians and gynecologists, it prevented him from testifying whether his conduct satisfied that standard. Similarly, the court permitted defense counsel to ask Dr. Lovett why he did not come to the hospital to determine personally the status of the fetus, but refused to allow him to testify whether his conduct had deviated from standard medical practice.

Ordinarily, the competency of a witness to testify as an expert is remitted to the sound discretion of the trial court. Absent a clear abuse of discretion, an appellate court will not interfere with the exercise of that discretion. *Henningsen v. Bloomfield Motors, Inc.*, 32 *N.J.* 358, 411, 161 *A.*2d 69 (1960). Nothing, however, prevents a medical doctor from testifying as an expert in his own case. Neither *Rule of Evidence* 56, *Rule of Evidence* 19, nor case law prohibits a defendant from testifying as an expert witness on his own behalf if the defendant is otherwise qualified. *See Nastri v. Franciosi*, 185 *N.J.Super.* 93, 94, 447 *A.*2d 581 (App.Div.1982) (noting that by testifying before medical-malpractice panel, defendant "necessarily gives oral expert opinion"); *Myers v. St. Francis Hosp.*, 91 *N.J.Super.* 377, 388, 220 *A.*2d 693 (App.Div.1966) (stating that "New Jersey law prohibits one from calling an adverse party as his expert witness and compelling him to testify as to opinions and conclusions unless he voluntarily agrees to do so"). The test of an expert witness's competency in a malpractice action is whether he or she has sufficient knowledge of professional standards to justify the expression of an opinion. *Sanzari v.*

*Rosenfeld,* 34 *N.J.* 128, 136, 167 *A.*2d 625 (1961). The weight of any such testimony, of course, is for the jury.

■ Here, Dr. Lovett, a licensed physician, had practiced obstetrics for many years. He was qualified to offer an opinion on the applicable standard of care and on the issue whether his conduct conformed to that standard. The failure to permit him to testify was a mistaken exercise of discretion.

The court's charge on emotional distress, to which defense counsel objected as constituting a directed verdict, suggested that the court had made up its mind that plaintiffs were entitled to recover. In relevant part, the court charged the jury:

> The law recognizes that in circumstances such as this involving the birth of a baby that there is an especially [sic] likelihood of genuine and serious mental distress which arises from the special circumstances that existed here. The birth of a severely damaged but live baby after expecting a dead fetus and the continued observation of the condition of the baby up until the time of death is recognized as a direct injury to the mother. *She suffers severe and genuine injuries in the form of emotional distress and mental anguish from this sequence of events. This suffering, our law recognizes, is experienced also by the father or the husband and arises by reason of the family relationship. They are entitled to be recompensed for the mental and emotional anguish they have suffered and will continue to suffer in their future recollection of these events.* .

[Emphasis added.]

Perhaps subconsciously, the court removed from the jury's consideration its determination of the nature of the parents' emotional distress and the extent to which their distress was related to the conduct of each defendant.

Trials remain both an art and a science. Sometimes we can no more separate the judge from the trial than we can "know the dancer from the dance." William Butler Yeats, *Among School Children, in The Tower* (1927). Our review of the record leads us to conclude that the passion of the proceeding adversely affected the trial court, which, perhaps without realizing it, allowed its feelings to infect the trial of both liability and damages.

■

IV

The final issue questions the amount of the verdicts. The judicial role in reviewing jury verdicts, although limited, is essential to a rational system of justice. A trial court should not disturb the amount of a verdict unless it constitutes a manifest injustice that shocks the judicial conscience. *Taweel v. Starn's Shoprite Supermarket,* 58 *N.J.* 227, 236, 276 *A.*2d 861 (1971). The appellate role is even more restricted. When reviewing the amount of a damage award, an appellate court should show appropriate deference to the trial court's "feel of the case." *Baxter v. Fairmont Food Co.,* 74 *N.J.* 588, 600, 379 *A.*2d 225 (1977).

Even with so limited a role, we find that the verdicts cannot stand. We turn first to the awards of $1,000,000 for Mrs. Carey's emotional distress and $500,000 for that of Mr. Carey. In ordering a new trial, we remain sensitive to plaintiffs' tribulations and their irrevocable loss from the baby's death. Although Mr. and Mrs. Carey's distress is understandable, it will not support the awards. Initially, they consulted Dr. Sadoff, a forensic psychiatrist. He referred Mrs. Carey to Dr. Janet Berson, a clinical psychologist. Dr. Berson saw Mrs. Carey ten times between December 20, 1983, and June 1984. At the visit in January 1984, Mrs. Carey complained that she was "very tense," had "crying jags," and was experiencing a recurrence of migraine headaches, from which she had suffered "on and off for ten to fifteen years." After that visit, Mrs. Carey returned to work. By May, when Mrs. Carey was pregnant, Dr. Berson found her to be "much improved." After the June session, Mrs. Carey did not again see Dr. Berson until March 28, 1989, when Mrs. Carey consulted her because of an "anxiety reaction" to the present litigation. Mr. Carey accompanied his wife at the initial visit and again on March 6, 1984. He never consulted Dr. Berson alone. Absent is any evidence of psychiatric hospitalization or significant interference with the lifestyle or employment relationships of either Mr. or Mrs.

Carey. The awards can be attributed only to prejudice, partiality, or passion. From the record, "it clearly and convincingly appears that there was a miscarriage of justice under the law," *R.* 4:49–1, which compels a new trial.

The same conclusion applies to the award of $550,000 for the baby's pain and suffering during her ten-day life. An award for pain and suffering is appropriate only for suffering that is conscious. *Eyoma v. Falco,* 247 *N.J.Super.* 435, 450, 589 *A.*2d 653 (App.Div.1991). Dr. Costarino carefully qualified his testimony by stating that the baby likely experienced "some pain." He added that "she may have been unconscious to the experience so in a sense of the fear and anxiety and the things that we usually associate with pain, she may have been not experiencing them in that same way." Furthermore, as the baby's condition deteriorated, her suffering diminished. Another of plaintiffs' medical experts, Dr. Richardson, concluded that although the baby probably was experiencing "some pain" when she was taken to Children's Hospital, she probably was not feeling any pain as of the sixth day. Consequently, we conclude that the verdict for pain and suffering was excessive.

We reach a similar conclusion concerning the $450,000 verdict for the baby's wrongful death. Damages for the wrongful death of an infant, like wrongful-death damages generally, are limited to economic matters. When parents sue for the wrongful death of a child, their damages may include the pecuniary value of the child's help with household chores, the pecuniary value of the child's anticipated financial contributions, and the pecuniary value of the child's companionship, including his or her advice and guidance, as the parents grow older. *See Green, supra,* 85 *N.J.* at 11–13, 424 *A.*2d 210; *see also Davis v. Elizabeth Gen. Medical Ctr.,* 228 *N.J.Super.* 17, 23, 548 *A.*2d 528 (Law Div.1988) (finding parents' *per quod* claim for loss of child's companionship and society permitted under New Jersey law). Not compensable under the Wrongful Death Act, however, is the parents' emotional distress caused

by the death of a child. *Green, supra,* 85 *N.J.* at 12, 424 *A.*2d 210. Indeed, the absence of any such recovery led to the recognition of a parental claim for emotional loss in *Giardina.*

The problem inherent in evaluating the economic value of a newborn's life is obvious. No one can know much, if anything, about the infant and his or her future economic worth. That difficulty, however, should not preclude any award. Some award is appropriate "even though the inferences, and estimate of damages, are based on uncertainties." *Green, supra,* 85 *N.J.* at 15, 424 *A.*2d 210.

We are nonetheless forced to conclude that a verdict of $450,000 is so excessive as to constitute a miscarriage of justice. Plaintiffs demonstrated that their family was close, each member supporting the others in various ways. The record is otherwise understandably silent about the infant's potential economic worth. Such slender proof cannot support so generous a verdict, even in this sad case.

The amount of the award demonstrates that it was the product of prejudice, partiality, or passion and that the entire verdict was tainted. *Taweel, supra,* 58 *N.J.* at 231, 276 *A.*2d 861. The source of the taint may have been the trial court's conduct or the tragic nature of the baby's birth and death, or both. In either event, the demonstrated prejudice, partiality, or passion requires a new trial on all issues. *See ibid.*

In concluding, we note that the legislatures in some states have imposed caps on the recovery for medical malpractice. See, *e.g., Ala. Code* § 6–5–544(b), –547 (Supp.1987) (limiting non-pecuniary damages to $400,000 and total recovery in medical malpractice action to $1,000,000); *Alaska Stat.* § 09.17.010(a), (b) (1986) (limiting recovery for non-economic losses to $500,-000); *Cal. Civ. Code* § 3333.2 (West 1992) (limiting damages for non-economic losses to $250,000); *Colo. Rev. Stat.* § 13–21–102.-5(1)–(3) (1993) (limiting damages awards for non-economic losses to $250,000 unless clear and convincing evidence justifies greater award, in which case limit is $500,000); *Haw. Rev. Stat.*

§ 663–8.7 (1992) (limiting damages recoverable for pain and suffering to $375,000) (repealed eff. Oct. 1, 1993); *Idaho Code* § 6–1603 (Supp.1987) (limiting non-economic damages to $400,000); *Ind. Code Ann.* § 16–9.5–2–2(a) (Burns Supp.1986) (limiting total amount recoverable for any injury or death to $750,000); *Kan.Stat.Ann.* § 60–3407(a) (1985) (limiting total amount recoverable for non-economic loss to $250,000 and total amount recoverable to $1,000,000); *La.Rev.Stat.Ann.* § 40:1299.42 B(1) (West Supp.1987) (limiting total amount recoverable for malpractice claims, exclusive of future medical care and related benefits, to $500,000); *Md. Cts. & Jud.Proc. Code Ann.* § 11–108(b) (1986) (limiting award for non-economic damages for personal injury to $350,000); *Mass. Gen.Laws Ann.* ch. 231, § 60H (West 1986) (limiting plaintiff's award to $500,000 "for pain and suffering, loss of companionship, embarrassment and other items of general damages unless the jury determines that there is substantial or permanent loss or impairment of a bodily function or substantial disfigurement, or other special circumstances in the case warrant a finding that imposition of such a limitation would deprive the plaintiff of just compensation for the injuries sustained"); *Neb.Rev.Stat.* § 44–2825 (Supp.1986) ("The total amount recoverable under the Nebraska Hospital–Medical Liability Act from any and all health care providers and the Excess Liability Fund for any occurrence resulting in any injury or death of a patient may not exceed five hundred thousand dollars for any occurrence on or before December 31, 1984, and one million dollars for any occurrence after December 31, 1984."); *N.M.Stat.Ann.* § 41–5–6 (Michie 1987) (limiting "the aggregate dollar amount recoverable by all persons for or arising from any injury or death to a patient as a result of malpractice [to] five hundred thousand dollars ($500,000) per occurrence"); *S.D. Codified Laws Ann.* § 21–3–11 (1986) (limiting total damage award in medical-malpractice cases to $1,000,000); *Utah Code Ann.* § 78–14–7.1 (Supp.1986) (limiting recovery for non-economic loses in malpractice actions to $250,000); *Va. Code Ann.* § 8.01–581.15 (Michie 1984) (limiting total

amount recoverable in medical-malpractice actions to $1,000,-000); *W.Va.Code* § 55–7B–8 (1986) (limiting amount recoverable as damages for non-economic loss to $1,000,000); *Wis.Stat. Ann.* § 893.55 (West 1986) (limiting total non-economic damages recoverable to $1,000,000).

The imposition of such caps, however, is for the Legislature. We do not purport to pass on their wisdom or constitutionality. See *Pfofst v. State*, 219 *Mont.* 206, 713 *P.*2d 495 (1985) (holding limit on governmental liability violates equal-protection clause of state constitution and state constitutional right to full redress of injury); *Arneson v. Olson*, 270 *N.W.*2d 125 (N.D.1978) (striking down limitation of health-care provider liability, stating limitation of preexisting right may not be arbitrarily imposed); *Brannigan v. Usitalo*, 134 *N.H.* 50, 587 *A.*2d 1232 (1991) (holding statutory cap on non-economic loss in personal-injury actions violates equal-protection clause of state constitution); *Carson v. Maurer*, 120 N.H. 925, 424 *A.*2d 825 (1980) (holding limit on non-economic loss in medical-malpractice cases violates equal-protection clause of state constitution). Our role is limited to defining the contours of a common-law claim in the absence of legislative guidance.

We affirm the Appellate Division's judgment to set aside both the $550,000 award for the infant's pain and suffering and the $450,000 wrongful-death award to the parents, reverse the judgment dismissing the parents' claim for emotional distress, and remand the matter to the Law Division for a trial on both liability and damages.

HANDLER, J., concurring.

In this litigation, the Court is confronted with a very clear case of malpractice committed on an expectant mother in the weeks and days preceding the birth of the infant, throughout the event of the birth itself, and thereafter during the brief time leading to the infant's death. The fairness and decency of

recognizing a duty of care directly owing to the mother is obvious beyond any doubt in this setting.

The Court refrains from characterizing the mother's cause of action, saying rather that the "principles" that underlie her claim are more important than the label. *Ante* at 57, 622 *A*.2d at 1286. Nevertheless, the Court seems to imply that the duty owed the mother and her claim arising from her baby's fatal condition may be more analogous to those of a "bystander" than of a patient herself.

The significance of the Court's apparent conceptualization of the mother's cause of action is its emphasis on the need to prove genuine and severe emotional injury. Extreme emotional injury is required as a basis for bystander liability, *see Frame v. Kothari*, 115 *N.J.* 638, 560 *A*.2d 675 (1989); *Portee v. Jaffee*, 84 *N.J.* 88, 101, 417 *A*.2d 521 (1980), as well as for tortious infliction of emotional distress, *see, e.g., Buckley v. Trenton Sav. Fund Soc'y*, 111 *N.J.* 355, 544 *A*.2d 857 (1988); *Strachan v. J.F.K. Memorial Hosp.*, 109 *N.J.* 523, 538 *A*.2d 346 (1988). The Court does suggest that the "unique relationship between a pregnant mother and her baby" can serve as a proxy for genuine and severe emotional distress. This relationship, the Court observes, "mitigates the need for the additional requirements of an 'indirect claim' for emotional distress," including any need for the mother to be " 'shocked'." *Ante* at 59, 622 *A*.2d at 1286. Nevertheless, the Court holds that the mother must still prove that she suffered severe emotional distress in order to prove a claim for emotional distress arising from the injury and death of her newborn baby. *Ante* at 62, 622 *A*.2d at 1288. In short, the Court seems to view the mother's claim in this case as a variant of bystander liability importing the need to demonstrate substantial emotional injury.

I am puzzled and troubled by the Court's reasoning, which in some ways relegates the mother to the status of a mere bystander when it is painfully obvious that she herself is the patient. The fatal injuries suffered by the baby occurred in the

course of treating the mother. I can only surmise that the Court has resorted to principles of bystander liability in order to require genuine and severe emotional injury as an element of the mother's cause of action. That the genuineness and severity of the emotional distress should remain dominant departs from the Court's prior decisions concerning direct injury to parents in the context of medical malpractice.

We have fully considered, addressed, and overcome any concern that emotional injury surrounding a tragic birth occasioned by malpractice must reach a minimum level of severity to constitute an appropriate and reasonable basis for compensating the mother for the wrong she has suffered. *See Giardina v. Bennett,* 111 *N.J.* 412, 545 *A.*2d 139 (1988); *Procanik v. Cillo,* 97 *N.J.* 339, 478 *A.*2d 755 (1984); *Schroeder v. Perkel,* 87 *N.J.* 53, 432 *A.*2d 834 (1981); *Berman v. Allan,* 80 *N.J.* 421, 404 *A.*2d 8 (1979). The emotional injury determines the amount, not the right, of recovery. The right of recovery is based on the breach of duty. The predicate of the cause of action in these circumstances should be the direct duty of care owing to the mother, based on the professional relationship between doctor and patient. That relationship necessarily implies that the mother should be able to recover damages for all provable injuries, including emotional harm regardless of degree, that proximately flow from the doctor's wrongful conduct. *See, e.g., Evers v. Dollinger,* 95 *N.J.* 399, 410, 471 *A.*2d 405 (1984). Indeed, the emotional injury flowing from a tragic birth occasioned by medical malpractice will rarely be meretricious or illusory. We ought not impose any requirement that emotional injury reach extremes before determining that the breach of duty based on the doctor-patient relationship allows the award of compensatory damages involving emotional injury.

The Court perceives the need to establish genuine and severe emotional injury because it fears that claims in these kinds of cases have the potential to engender speculative and excessive awards. *Ante* at 58, 622 *A.*2d 1286. The Court also expresses

apprehension over the effects of expanding malpractice liability. *Ante* at 58, 622 *A*.2d at 1286.

To a great extent the Court's concerns are fueled by matters that are not settled or established by the record and, indeed, have generated real controversies as a matter of governmental and social policy.[1] Those concerns should not impel us in a case such as this to conclude that the floodgates will be opened to emotional injury that is unreal, feigned, imaginary, or exaggerated. Far clearer than the bases for these concerns is that in cases of this kind, the injury to the mother is patent and palpable. Common experience tells us that not only is maternal emotional injury in this setting genuine and severe, it is virtually inescapable.

The Court also posits only an indirect duty owing to the father. In that respect, it departs from the view that the father's claim against the doctor, based on the mishandling of his wife's pregnancy, may involve a direct duty owing to the father. Thus, we have recognized that a direct duty is owed to the father where the malpractice consists of genetic counseling. *See Procanik, supra,* 97 *N.J.* 339, 478 *A*.2d 755 (1984); *Schroeder, supra,* 87 *N.J.* 53, 432 *A*.2d 834 (1981); *Berman, supra,* 80 *N.J.* 421, 404 *A*.2d 8 (1979). Implicit in those decisions is that both parents participate in the doctor-patient relationship with respect to the conception and gestation of their child, and the

---

1 For example, recent studies of medical malpractice in New Jersey and New York bring into question the hue and cry over expanding malpractice liability. A study of patients "significantly injured by malpractice" in New York State hospitals found that only one in eight patients ever made a claim. "Medical Malpractice: Whose Lottery Is It Anyway?" *N.Y.L.J.,* January 26, 1993, at 2. A study of medical-malpractice claims in New Jersey found that insurers fail to compensate about 10% of victims of "indefensible" malpractice, and defensible claims were usually not compensated. Mark I. Taragin, et al., *The Influence of Standard of Care and Severity of Injury on the Resolution of Medical Malpractice Claims,* 117 *Annals of Internal Medicine* 780, 784 (1992). The New Jersey study also found that the defense won 75% of cases reaching trial, even for indefensible or unclear cases. Huge jury awards were in fact rarely awarded. *Id.* at 783–84.

doctor in that setting counsels both parents and owes both of them the duty of exercising reasonable medical care. We have similarly recognized that a duty is directly owing to the father in the circumstances leading to a tragic stillbirth. *Giardina, supra,* 111 *N.J.* at 419, 545 *A.*2d 139.

The facts of this case demonstrate that the father was personally and directly involved in the events surrounding the treatment of the mother during her pregnancy and the birth of the infant. The Court observes: "When the father is drawn sufficiently into the treatment of the mother and baby, the physician's duty to him is like that owed to the mother." *Ante* at 61, 622 *A.*2d at 1287. The Court, however, chooses to explain and posit the duty owed to the father based only on his status as a "bystander" in the treatment of his wife and child. I disagree.

The circumstances of this case suggest that a duty of reasonable medical care was undertaken and directly owed to the father as a participating parent, as it was to the mother. Those circumstances should serve as the basis for determining that the father has a cause of action based on the breach of that duty. To characterize the father's status in this context as a "bystander" is to miscast the role of the father and the responsibility of the doctor to the family. When the father has been directly involved in the treatment of the mother and birth of the child, whether or not he qualifies as a "bystander," he should be entitled to recover for genuine emotional injury resulting from the doctor's malpractice.

O'HERN, J., concurring in result.

*For affirmance in part; for reversal in part; for remandment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —None.