706 A.2d 736

ROBERTO ARENAS, INDIVIDUALLY AND AS ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF ANDRES ARENAS AND MARIA ARENAS, PLAINTIFFS–APPELLANTS/CROSS–RESPONDENTS, v. LORRAINE M. GARI, M.D., DEFENDANT–RESPONDENT/CROSS–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 19, 1998—Decided Mar. 2, 1998.

1

2

4 

Before Judges SHEBELL, D'ANNUNZIO and COBURN.

*Jerrold D. Goldstein* argued the cause for appellants/cross-respondents.

*Lauren Koffler O'Neill* argued the cause for respondent/cross-appellant (*Post, Polak, Goodsell & MacNeill,* attorneys; *Ms. O'Neill,* of counsel, and on the brief).

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

This appeal and cross-appeal follow the trial of a medical malpractice action and the post-trial grant of a remittitur. We reverse and remand for a retrial as to all issues. The complaint named Somerset Pediatric Group (Pediatric Group) and Lorraine M. Gari as defendants. However, Pediatric Group was dismissed from the case at trial. Following a six day trial, the jury rendered its verdict on July 24, 1996. It found defendant liable for damages on the survival claim in the amount of $500,000, after the wrongful death and emotional distress claims were withdrawn from jury consideration by the trial judge. On August 5, 1996, defendant filed a motion seeking, alternatively, judgment notwithstanding the verdict, a new trial or remittitur. On November 22, 1996, the judge issued a letter opinion denying the motions for judgment notwithstanding the verdict and for a new trial, but granting a motion for new trial on damages, unless plaintiffs accepted a remittitur reducing the damages awarded to $150,000.

On February 22, 1997, plaintiffs filed a Notice of Appeal from the November 22, 1996 letter opinion, which apparently was not reduced to an order. *See R.* 2:2–3(a)(1) (appeals are from final judgments of the Superior Court trial divisions.) Defendant filed a motion for leave to file a cross-appeal *nunc pro tunc* on March 17, 1997, and a motion for stay pending appeal. On April 7, 1997, we granted leave to appeal and leave to cross-appeal and denied defendant's motion for a stay.

The deceased child, Andres Arenas, was born on February 19, 1991. He lived with his parents, Maria and Roberto Arenas, in North Plainfield. Maria had arrived in the United States from Columbia in 1982. Roberto had been in the United States since 1969. The thirty-eight year old Maria testified at trial using an interpreter. The Arenas family consisted of two children, ages one-and-a-half and two-and-a-half years at the time of trial, born after Andres' death.

Andres was a happy and healthy child, however, on October 16 and 17, 1992, he was not feeling well or breathing easily. He appeared listless, pale and was vomiting. He had a temperature of 102 degrees. Andres was given some Tylenol on Saturday, October 17, but this did not relieve the problem. The next day, Andres was crying a lot, coughing and vomiting. Roberto called Pediatric Group and explained the symptoms as fever, coughing and vomiting. He was given an appointment at 1:00 p.m. Andres was crying uncontrollably as his parents took him into defendant's office. Roberto described Andres' symptoms to defendant. Roberto did not feel defendant was paying much attention to his description, because she was writing something down. Roberto did feel, however, that he was able to understand and be understood by defendant.

According to plaintiffs, defendant did not put an instrument in Andres' ears or nose, nor did she look in his eyes, touch his stomach or ask about his food or liquid intake or urination. They also said defendant never took Andres' temperature or felt his forehead or back of his neck with her hands. She listened to

Andres' chest and back with a stethoscope "just for a moment and no more" and Andres was crying the whole time. Roberto asked defendant about Andres' skin, which was blue, and defendant put her hands on Andres and said he had a cold flu. Defendant told Maria and Roberto that Andres would be fine in two or three days, that he just had "a flu," and that he was agitated because of the fever. Defendant did not prescribe any medications but gave them two samples of "Tempera" "for the flu" or "if the fever is high." Defendant also said that they should give Andres Pedialyte every two or three hours. The entire examination took "no longer than five minutes," and defendant did not indicate that the parents should call her back.

According to defendant, plaintiffs complained that Andres was vomiting, had a fever, and was crying a lot. Because Andres had a fever, defendant looked for the things that might be treatable with antibiotics or otherwise, because the majority of childhood illnesses are viral. Typically with feverish children, defendant would ask a lot of questions about what is going on with the child at home and his symptoms, and she then would examine his general attitude and look him over physically for sores, stiffness, infection, rashes and the like.

Defendant explained it had been unnecessary for her to take Andres' temperature because she knew from the parents that Andres had a fever, and the number itself did not matter in determining how to treat him. She had noted in the chart a "tactile temp," meaning that the fever was not identified using a thermometer. Defendant said she asked Roberto how high the temperature was, and it was her understanding that the temperature was taken without a thermometer. Defendant said that she did not feel Andres had any significant fever at the time of the examination. Defendant indicated that although she had a great deal of difficulty communicating with Roberto without a Spanish interpreter, she did feel that he understood her.

According to defendant, she found Andres to be alert and breathing comfortably. Using a stethoscope on Andres' chest and

back, she listened to his chest sounds and heard only clear breath sounds with no abnormalities; specifically, she heard no "rales, that are crackling noises like we hear with pneumonia," or wheezing. There was also no decrease in the breath sounds that might also be associated with asthma or pneumonia, nor any extra effort needed in his breathing. She would have done a chest x-ray had there been any signs of respiratory distress, or if the parents had told her the child was coughing and had a fever. Defendant had diagnosed pneumonia in small children hundreds of times, but in this case she saw no evidence of it. She also had seen children who had aspirated foreign objects into their lungs. She was familiar with a respiratory noise called "stridor" that would occur if an object was in the child's trachea, and with wheezing on one side that sometimes also occurs with aspiration. Andres' examination did not show any of these symptoms. Defendant admitted, however, that if Andres had been crying inconsolably, it would have been very difficult to listen to his breath sounds with the stethoscope.

Defendant also said that she examined Andres' ears, using an autoscope which has a light on it, and found the ears to be fine, with no sign of infection. She also looked in his mouth with the autoscope. She felt his neck for stiffness, which could indicate meningitis, but found his neck to be supple. She felt his abdomen, and it was soft, indicating no obstruction or enlarged organs. Defendant did not recall whether Andres was crying during the visit, but said it would not be unusual for a child his age to have "stranger anxiety" that would be exacerbated when the child is sick and unhappy.

Given the complaints of vomiting and fever, and the illnesses she had been seeing in the community at that time of year, defendant concluded that Andres "probably had an early gastroenteritis, which is a stomach virus." This illness usually had a progression of vomiting, followed by diarrhea. Even though defendant did not feel that Andres had a fever, the history of plaintiffs' reports of his fever plus their reports of his vomiting,

led to that diagnosis. Defendant did not note diarrhea. She told plaintiffs to give Pedialyte to avoid dehydration because he would be losing fluids with his vomiting; she noted, however, that he was alert during the examination, and that dehydrated children are not alert. She admitted that her record of the examination did not indicate anything about mucus membranes, presence of tears or sunken eyeballs, all of which would have indicated the level of hydration. Defendant also admitted that the record did not indicate how well Andres had been eating, and that this would have been a significant factor in her determination regarding his illness. Defendant, however, stated that not everything is written in the records, just significant positive and negative factors. Defendant also claimed she told the parents to call or come back if Andres did not get better.

When they returned home, Maria held Andres for a while and he fell asleep. When he awoke, he continued to cough, cry, vomit and drink little during the rest of that day. The next day, Monday, Roberto went to work and Maria remained at home. She gave Andres the Tempera, but she observed no improvement in his symptoms. Andres continued to drink very little from the bottle, only three or four ounces out of the eight-ounce bottle, and he wet his diapers less than usual. He ate nothing and played very little. Andres showed no improvement on Tuesday and he continued to have a 102 degree temperature and was coughing more frequently.

Maria discussed Andres' condition with Roberto during the day on Tuesday, and Roberto stopped at Pediatric Group on the way home to see about bringing Andres in for a follow-up visit. Roberto saw another doctor because defendant was not there. The doctor assured him that Andres would feel better in a couple of days. Roberto did not have an opportunity to explain Andres' symptoms, and the doctor did not have Andres' file or any of Andres' medical records in front of him. Aside from this contact, plaintiffs made no attempts to call or visit defendant or Pediatric Group after October 18, 1992.

When Roberto got home that evening, he thought Andres seemed a little better, because he was not crying. Maria testified that Andres slept that night in an agitated state, which was unusual for him. According to Roberto, Andres was breathing hard as he slept, which differed from his breathing before he got sick.

On Wednesday, October 21, Andres awoke at around 8:00 a.m., and drank only about two ounces from his bottle. He continued to be pale with a 102 degree temperature, and he did not eat anything. Maria remained in the bedroom with Andres at her feet playing with some porcelain statues for more than half an hour. When Maria picked Andres up to change his wet diaper, Andres started coughing and choking. Maria opened the window and screamed out to some men outside that her son "had taken a turn for the worse." She asked two men to call an ambulance. The ambulance crew took Andres away and did not allow Maria to go with them. When Maria and Roberto saw Andres later at the Muhlenberg Hospital, he had already died.

Eugene P. Fazzini, a pathologist with Somerset Pathology Associates, acting as County Deputy Medical Examiner for Somerset County, performed an autopsy on Andres. Fazzini had received Andres' medical history from the Muhlenberg Emergency Room records, which indicated that Andres had severe coughing and stopped breathing. The records also indicated that the Mobile Intensive Care Unit had intubated Andres at the scene by inserting an endotracheal tube into his windpipe to deliver oxygen.

Fazzini's autopsy findings were that Andres had a pneumonia predominantly in the right lung but also to a lesser extent in the left lung, caused by a firm, uncooked bean in the trachea. The pneumonia was most severe in the right lower lobe of the lung, which appeared firmer and congested. Fazzini called this an "obstructive pneumonia," which occurs when the airway is partially obstructed by something, such as a foreign body or more commonly by tumors, where the mechanism for clearing infectious particles from the lung are interrupted. After viewing sections of

the lung under a microscope, Fazzini concluded the pneumonia was present for thirty-six hours at an "absolute minimum" and as many as seventy-two hours. The bean was first partially obstructing the airway, and then was probably coughed up and lodged in the glottis—the space between the vocal chords, at the top of the windpipe and within the larynx—obstructing the airway and causing the death. When Fazzini found the bean, it was in the lower part of the trachea, or windpipe, just above the "main carina" where the windpipe branches off into the main bronchi. Fazzini believed that the bean had been in the glottis, where it blocked the airway and caused the death, and that it was pushed down into the trachea when the endotracheal tube was inserted into Andres' windpipe.

Fazzini had not found any inflammation or irritation of the trachea, which he would expect to see if the bean had been sitting in one position in the trachea. Nor did he observe any erosion of the "mucosa" which is the "epithelium lining of these airways." He concluded that these absences of localized irritation meant that the bean was not fixed in one position. The small size of the bean enabled it to pass up and down within the trachea. Looking at the right bronchial area, Fazzini did not see anything consistent with the presence of a foreign object. He did not find anything in the gastrointestinal area to indicate stomach illness.

Jack J. Schwartz, M.D., plaintiff's expert in pediatric medicine, reviewed Andres' records from the October 18, 1992, medical examination by defendant. He said that Andres fell into the age group from zero to twenty-four months when children are "uniquely susceptible to severe, serious complications of infectious diseases." The diseases of greatest concern at that age are meningitis, pneumonia, sepsis or bacteria in the blood stream, and gastroenteritis. There is viral pneumonia, which is unusual for children under five years old, and bacterial pneumonia. For children Andres' age, the bacteria would be streptococcus pneumonia and hemophilus influenza type B, either of which could be present in obstructive pneumonia.

The expert said diagnosis of pneumonia would come from listening for rales in the breath sounds. If the child were crying inconsolably so that the breath sounds were difficult to evaluate, counting the respiratory rate and ordering a chest x-ray should be done. Having reviewed Fazzini's report, Schwartz found it within a reasonable medical probability that the pneumonia was present at the time defendant examined Andres, although he could not be certain because the organism involved in Andres' pneumonia was never identified. Schwartz further opined that "there was little done to evaluate the baby" and that "if the evaluation had been carried out, that that was the last chance the baby had to survive."

According to Schwartz, defendant deviated from the accepted standards of medical care in two ways: by failing to take and record the temperature, given Andres' age group; and by failing to evaluate his state of hydration, given the history of vomiting for two days, with fever. Schwartz denied that a doctor could determine whether a patient has a fever by looking at the patient. Schwartz testified that if Andres had been dehydrated and this were identified and treated with intravenous fluids, "it may have made a difference in the baby's outcome." In his deposition, however, Schwartz had agreed that he could not say whether, if the hydration had been evaluated, there would have been a difference in the child's ultimate outcome.

Had he observed both an elevated temperature and dehydration, Schwartz would have done a blood count. Schwartz admitted that he did not know if Andres' blood count would have been abnormal, because it was not done. If the blood count result had been elevated, however, a blood culture should be done because of the uniquely high risk to Andres' age group of blood stream infections, and he would have taken a chest x-ray. Assuming the child's pneumonia were identified, Schwartz would have recommended hospitalizing him for intravenous antibiotic treatment, because oral antibiotics would not be retained due to the vomiting. Schwartz further opined that protocols for an infant who has a fever would be that "we would expect to have the baby come back

if there is no progress within 48 hours. If there is progress but the fever persists, then we would expect the baby to come back if the fever goes beyond 48 hours." He also said the recommendation for follow-up is usually indicated in the patient's record, but that no such note was made here.

William L. Lupatkin, M.D., defendant's pediatrics expert, opined that defendant did not deviate from the accepted standards of medical care. When a child comes in with complaints of fever and vomiting, Lupatkin believed that the fact of the fever at home was significant but that the doctor usually would not take the child's temperature at the office because it is a "one time" temperature. He would not ordinarily take a blood culture unless the child looks very ill. Because the physical examination showed no breathing difficulties, there was nothing that would indicate that a chest x-ray was warranted. Lupatkin further opined that hydration can be determined by viewing whether the mucous membranes are moist, and he concluded from the records that Andres "was hydrated."

Lupatkin also described defendant's diagnosis of acute gastroenteritis as a "diagnosis of exclusion," meaning that because there was not a focus of infection her diagnosis resulted from the illness being "not something else." Lupatkin said that if a child aspirated a foreign object, you would "expect a lot of coughing, because of the foreign object in the trachea moving in the trachea." There might also be wheezing, but not necessarily, depending upon the size and location of the object.

Lupatkin described fever, cough and rales as the expected symptoms for a child with pneumonia. Since he believed none of these were present during Andres' examination by defendant, there was nothing defendant "could reasonably have been expected to do that would have changed this outcome" for Andres. He agreed with Schwartz that, had Andres appeared worse during the examination, a blood count possibly followed by a blood culture could have been ordered and then antibiotics, but he said even these would not have prevented Andres' outcome. Had a chest x-

ray been ordered, he said it would not have shown the bean, and it may or may not have shown the pneumonia.

James Lewis, D.O., plaintiff's expert in forensic pathology, served as the chief medical examiner for Gloucester County. Upon review of Andres' record, Lewis concluded that the immediate cause of death was "an airway occlusion due to aspiration of a foreign body into the trachea, into the windpipe" and the underlying cause of death was "obstructive bronchial pneumonia of the right lower lobe due to aspiration of the foreign body in that area." He concluded that a kidney bean had been swallowed and went down the wrong pipe, through the trachea and into the right lower lobe of the lung. The body reacts to that foreign object by causing a reaction in which bacteria starts to build up and a pneumonia develops, to defend against the foreign object and attempt to remove it from the body. This process probably resulted in the bean being made a little smaller and becoming slippery by being covered with mucus. Then when Andres coughed, the bean lodged right in the middle, in the "bifurcation" so that air could not get past it to either lung.

Defendant's pathologist, Robert R. Rickert, co-chairman of the Department of Pathology at St. Barnabas Medical Center, reviewed the autopsy reports and found that three of the four sections of the lung showed "evidence of a very acute bronchial pneumonia" which would have been caused by bacteria or virus. It "definitely was not an obstructive pneumonia" because the area of the lung beyond the obstruction would have turned golden if it was that type of pneumonia. He opined that the pneumonia was not more than three or four days old, because there was no evidence of "necrosis," meaning tissue death. Furthermore, there was no spread of the pneumonia to the surface of the lung, which occurs when the pneumonia is of longer duration, and no evidence of "organization," when the tissue begins to heal itself usually after four or five days, or longer. He further opined that the cause of death was asphyxiation due to the bean becoming lodged in the glottis. He felt that the bean's description in the autopsy

report as "firm" supported his view that the bean was aspirated just prior to Andres' death. He did agree, however, that location of a bean in the right lower lobe of the lung could cause pneumonia.

## I

We first consider the cross-appeal in which defendant asserts that a new trial is required as to all issues because juror number six should have been dismissed by the judge. We agree.

Defendant contends that the trial court erred in failing to excuse juror number six for cause, after the parties had exhausted their peremptory challenges. During the *voir dire*, a woman who identified herself as a registered nurse working in obstetrics at a hospital was seated as juror number six. When asked whether she knew of any reason why she should not sit or could not be fair and impartial, she answered "no." Upon further inquiry, the juror said she would sometimes do an initial assessment of the child in the newborn nursery, but that she usually worked in the delivery room. She also served as head nurse of the hospital's post-partum unit for twelve years. No further questions were asked of juror number six. The parties exercised all of their challenges, and thereafter, the jury was sworn.

The next day, before the trial began, juror number six indicated that she wished to speak to the court and the following colloquy took place:

JUROR: Yesterday when you were asking me the questions, I was very nervous. And driving home I said it was important for me to tell you that I'm a nurse at the hospital, but I'm also a nurse in the nursing supervisor and administrative capacity, where on the weekends I do deal with the nurses and I run the whole hospital.

On several instances, I had an incident with one physician, and I'm bringing in front of the grievance committee because of incidences where I had stressed the policy, and he didn't want to take any direction from me.

THE COURT: Okay.

JUROR: It could also lead into sexual harassment as well. I've had many instances with many physicians where, in my position, I have to enforce the policy.

THE COURT: Okay.

JUROR: And—

THE COURT: This is some kind of admissions policy or something?

JUROR: The policy that I was instructing him, he had a patient that needed a consult. And in front of the nurses, he told the nurses very arrogantly that they had to call the consult. And our policy at [the hospital] is that the doctor, the attending physician has to call the consultation physician. And I stressed that policy. And his words was no woman is going to tell me what to do. And even though it's a policy, we don't do that. And he proceeded to pick up the phone and call every single person known to man above me.

And I, previously to this incident, he was, and he does this on several instances, his conduct was inappropriate in a sexual manner.

THE COURT: I appreciate that you feel that you need to call this to my attention. It's significant to me. It strikes me, candidly, that like everyone else in life, you ran into one bad apple. And I cannot—I don't think it has anything to do with this case. I don't think there's such an issue.

Do you have any reason to believe that it's going to effect your ability—

JUROR: I don't think so, but I felt it was important to tell you.

THE COURT: I appreciate that.

JUROR: I just also want to tell you my parents are both cardiac patients, and I also have asthmatic people in my family. Being very nervous, I was like, I told her all the wrong things.

THE COURT: Every time we pick a jury, we have someone who goes home and remembers. And I'd rather have someone remember and come tell me than have somebody go home and be afraid to come tell me. You haven't said anything that causes me to conclude that you're not fit for service. And you're not looking at me and telling me you're not able to be fair and impartial. But I do appreciate your candor. We're going to have you go back in the room.

JUROR: Okay, thank you.

Out of the juror's presence, defense counsel asked to have her dismissed for cause, or alternatively for additional questions to be asked, because counsel felt the juror may have problems with physicians generally, rather than just with one particular physician. The judge stated that neither party had any peremptory challenges left, and had the juror return for the following further exchange:

THE COURT: [juror number six], sometimes I don't ask all the questions the lawyers think are important for me to ask. Do you believe that you have difficulty with one doctor, or do you believe you have a problem with doctors generally? *Will it be difficult for you to be fair and impartial to the Doctor Defendant, or not?*

JUROR: *Honestly, I was questioning that last night.* Because of the fact in my role as a supervisor, it's important for me to stress the policies and procedures of the institution. And sometimes in that role, I get some flack from the physicians.

In this particular case, as an obstetrical nurse, I feel I could be impartial. *In one sense, I'm not really sure. I'm not really sure.*

THE COURT: Well, I have to decide whether, and I very often tell jurors this, we don't expect people to come in here hermits who have no experience in the world. We don't expect people to come in here and not have had difficulties with physicians, or lawyers, or plumbers, or anybody else in their life.

What we expect is that people can put aside any preconceived ideas they have and give everybody the same blank piece of paper that you see right over there on the side. And sometimes that's hard.

But what we really need to find out from people is whether they think that they can do that and be fair to both sides. Both sides start out just like that blank piece of paper. They start writing information about people based upon a whole host of information, including what they say, how they say it, the same way you judge people every day of your life.

Now, if you are telling me that you have these experiences and they're somewhere in your mind, but you believe that you can put them aside and be fair to both sides, that's one thing. If you tell me nope, doesn't matter what the evidence is going to be, I'm going to find against that doctor, that's another thing. I need to know where on that spectrum, and that's a broad spectrum, but I need to know where on that spectrum you are.

JUROR: *I think I could be pretty fair.*

THE COURT: You think you can put aside preconceived ideas about a doctor, some doctors?

JUROR: Uh-huh.

[Emphasis added.]

Defense counsel then repeated her request that the juror be removed for cause, focusing primarily on the juror's response "I'm not really sure" to the inquiry as to whether it would be difficult for her to be fair and impartial to defendant. The judge asked whether there were issues in the case regarding a doctor's failure to follow directions or orders, and defense counsel answered no, "just the idea that maybe [defendant] wasn't following proper protocol or procedure is my concern."

 Trial court decisions as to whether to excuse prospective jurors for cause are given substantial deference. These decisions are generally discretionary as they implicate the trial judge's superior ability to evaluate the whole person in the courtroom. *Catando v. Sheraton Poste Inn,* 249 *N.J.Super.* 253, 258, 592 *A.*2d

294 (App.Div.), *certif. denied,* 127 *N.J.* 550, 606 *A.*2d 364 (1991) (citing *State v. Marshall,* 123 *N.J.* 1, 85–87, 586 *A.*2d 85 (1991) and *State v. Singletary,* 80 *N.J.* 55, 64, 402 *A.*2d 203 (1979)). It is, however, important to recognize that securing and preserving an impartial jury goes to the very essence of a fair trial. *Id.* at 258–59, 592 *A.*2d 294 (citing *State v. Williams,* 93 *N.J.* 39, 60, 459 *A.*2d 641 (1983)).

It is axiomatic that all parties to litigation are "entitled to have each of the jurors who hears the case impartial, unprejudiced and free from improper influences." *Wright v. Bernstein,* 23 *N.J.* 284, 295, 129 *A.*2d 19 (1957). The jurors must not only be fair and impartial, they also must appear so, in order to maintain the litigants' confidence in the basic fairness of the trial. *Catando, supra,* 249 *N.J.Super.* at 261–62, 592 *A.*2d 294. "If a party's reasonable apprehension of unfairness can be avoided without injuring the rights of others, a sound exercise of judgment favors excusing a juror." *Id.* at 262, 592 *A.*2d 294.

In the criminal context, our Supreme Court has held that when a juror incorrectly omits information during *voir dire,* the omission is presumed to be prejudicial. *State v. Cooper,* 151 *N.J.* 326, 349, 700 *A.*2d 306 (1997). In *Cooper,* where a juror failed to state that she had a cousin in federal prison, the Court reiterated the following rationale from *In re Kozlov,* 79 *N.J.* 232, 398 *A.*2d 882 (1979):

> Where a juror on *voir dire* fails to disclose potentially prejudicial material, such as that involved in this case, a party may be regarded as having been denied [a] fair trial. This is not necessarily because of any actual or provable prejudice to his case attributable to such juror, but rather because of his loss, *by reason of that failure of disclosure, of the opportunity to have excused the juror by appropriate challenge, thus assuring with maximum possible certainty that he be judged fairly by an impartial jury.*
>
> [*Id.* at 239, 398 *A.*2d 882 (emphasis added).]

In *Wright, supra,* a personal injury action arising from an automobile collision, a juror had failed to answer affirmatively when asked during *voir dire* whether any family member had been involved in any "accident cases," because, according to the

juror, he thought the attorneys meant only automobile accident cases. *Wright, supra,* 23 *N.J.* at 292, 129 *A.*2d 19. The juror's mother was the plaintiff in a slip-and-fall personal injury action which was heard in the same court while the juror was deliberating in the automobile accident case. *Id.* at 291, 129 *A.*2d 19. The jury returned a verdict for the plaintiff before the defendants' motion for a mistrial could be decided; and thereafter, motions for mistrial and for a new trial were both denied. *Id.* at 292, 129 *A.*2d 19.

The Supreme Court reversed and remanded for a new trial, holding that the juror's conduct

> had the effect of nullifying the purpose of the examination and was as effective as though the trial court had denied the right of challenge. *The denial of the right of peremptory challenge is the denial of a substantial right.* When it is not waived by conduct, it is prejudicial *per se* and harmful, and *a party is not required to make an affirmative showing that the denial of his right to peremptory challenge had resulted in prejudice and injury to his cause of action on the merits.*
>
> [*Id.* at 295, 129 *A.*2d 19 (emphasis added).]

Significantly, the Court further explained that the test is "not whether the irregular matter actually influenced the result, but whether it had the capacity for doing so." *Ibid.* The Court added: "The stringency of the rule is grounded upon the necessity of keeping the administration of justice pure and free from all suspicion of corrupting practices." *Ibid.*

In *Catando,* where the failure to dismiss the juror for cause was found harmless because of plaintiffs' ability to use a peremptory challenge to excuse the juror, we stated:

> if a challenge for cause is erroneously denied but the party does not use an available peremptory challenge to excuse the juror, the error is harmless; if all peremptory challenges have already been exhausted, and the challenged juror, therefore, sits, the error requires reversal. . . .
>
> [249 *N.J.Super.* at 264, 592 *A.*2d 294.]

Here, the juror appeared to be doubtful of her ability to be fair, first stating "I was questioning that last night," then stating only "I *feel* I could be impartial," followed by "I'm *not really* sure," next "I *think* I could be *pretty* fair," and finally answering "uh-

huh" when asked if she could put aside any preconceived ideas about doctors.

Juror number six expressed sufficient uncertainty in her responses to have understandably left defense counsel with doubt as to whether the juror could be impartial. As described in *Cooper* and *Wright*, the issue is not one of actual or probable prejudice, it is defendant's lost opportunity to exercise a peremptory challenge to excuse the juror. Because juror number six was not excused by the judge, despite defense counsel's repeated requests for removal for cause once the juror disclosed information as to her experiences, it is apparent that counsel would have challenged this juror had any preemptory challenges remained. Defendant was, therefore, prejudiced by the judge's refusal to excuse the juror for cause as requested, particularly as defense counsel had not exhausted her challenges when the juror gave her original answers on *voir dire.*

Moreover, it is clear that several potential jurors who gave similarly equivocal answers during *voir dire* were excused for cause. The only difference we perceive is that the jury had already been sworn when the issue regarding juror number six came to light. This circumstance should not have deterred the judge, since excusing the juror would still have left seven jurors on the jury. The judge had discretion to address the issue and should have dealt with this challenge for cause in the same manner as before the jury was sworn. *Rule* 1:8–3(b) provides in relevant part: "A challenge to any individual juror which by law is ground of challenge for cause must be made before the juror is sworn to try the case, but the court for good cause may permit it to be made after the juror is sworn but before any evidence is presented."

Reversal of the entire verdict is, therefore, required. Thus, defendant's contention that the jury's verdict of $500,000 was so grossly excessive and disproportionate to Andres' survival action as to require a new trial need not be discussed.

■ We reject defendant's contention that the display of Andres' photograph during the trial was unduly prejudicial, serving only to evoke sympathy from the jurors. The trial judge found that there was nothing inflammatory or overly prejudicial about using a picture of the child. Moreover, the judge did not permit the photograph to be taken into the jury room.

■ *N.J.R.E.* 403 provides: "Except as otherwise provided by these rules or other law, relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." Our courts have held that "admissibility of photographs of the victim of a crime rests in the discretion of the trial court, and the exercise of its discretion will not be reversed in the absence of palpable abuse." *State v. Rose,* 112 *N.J.* 454, 535–36, 548 *A.*2d 1058 (1988) (quoting *State v. Thompson,* 59 *N.J.* 396, 420, 283 *A.*2d 513 (1971)). The mere fact that photographs may be cumulative of other testimony in the case does not of itself render them inadmissible. *See Tirrell v. Navistar Int'l, Inc.,* 248 *N.J.Super.* 390, 407–08, 591 *A.*2d 643 (App.Div.), *certif. denied,* 126 *N.J.* 390, 599 *A.*2d 166 (1991) (finding no error in the trial court's admission of photographs of decedent with his wife and children; the photographs "showed an intact family, verified the closeness of the children's ages, and indicated an apparent bond among the family members").

We find no abuse of discretion in the trial judge's decision to admit Andres' photograph. The photograph was not objectionable on its face; it showed a standing, smiling toddler. This photograph served both to identify the child and to corroborate plaintiffs' testimony that Andres had been a healthy, happy child. There is nothing to suggest that the photograph unduly prejudiced the jury.

■ It is also necessary that we consider defendant's contentions that the trial judge erred in not entering judgment in defendant's favor because: (a) there was no proof presented that

defendant's treatment and care proximately caused Andres' death; and (b) there was no testimony that would support an award for plaintiffs' survival action. We do not accept either argument.

"To establish a *prima facie* case of negligence in a medical malpractice action, a plaintiff must present expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury." *Gardner v. Pawliw,* 150 *N.J.* 359, 375, 696 *A.*2d 599 (1997) (citations omitted). On the issue of proximate cause, a modified standard applies to cases "in which a defendant's negligence combines with a preexistent condition to cause harm—as distinguished from cases in which the deviation alone is the cause of harm...." *Scafidi v. Seiler,* 119 *N.J.* 93, 108–09, 574 *A.*2d 398 (1990). The modified standard "apparently applies to all medical malpractice cases in which there is evidence that the defendant's negligence increased the risk of the occurrence of the ultimate eventuating harm by failing to arrest the patient's downward medical course." *Battenfeld v. Gregory,* 247 *N.J.Super.* 538, 547, 589 *A.*2d 1059 (App.Div.1991).

In those cases where the modified standard applies, a plaintiff suffering from a preexisting condition must prove that, as a result of a defendant's negligence, plaintiff experienced an increased risk of harm from that condition, and that the increased risk of harm was a substantial factor in causing the injury ultimately sustained. *Gardner, supra,* 150 *N.J.* at 375, 696 *A.*2d 599, (citing *Anderson v. Picciotti,* 144 *N.J.* 195, 210, 676 *A.*2d 127 (1996)). The "substantial factor" standard requires the jury to determine whether the deviation from the standard of care, "in the context of the preexistent condition, was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause." *Scafidi, supra,* 119 *N.J.* at 109, 574 *A.*2d 398.

This modified test is necessary because the traditional "but for" causation test is incapable of application where the harm is produced by concurrent causes. *Gardner, supra,* 150 *N.J.* at 377, 696 *A.*2d 599; *Scafidi, supra,* 119 *N.J.* at 109, 574 *A.*2d 398. The

standard "but for" charge could "confuse or mislead a jury" in such cases, because that language "assumes that the defendant's negligence *began* a chain of events leading to the plaintiff's injury." *Scafidi, supra,* 119 *N.J.* at 102, 574 *A.*2d 398.

At trial, plaintiffs argued that the increased risk/substantial factor standard of *Scafidi* was applicable. Defendant disagreed, arguing that her whole position was that neither the bean nor pneumonia were there, so there was no preexisting condition that would implicate *Scafidi.* The trial judge readily recognized that there was sufficient evidence for the jury to find that the bean and/or pneumonia was present when defendant examined Andres' and that it was reasonably probable that his condition could have been diagnosed if proper medical procedures had been followed. *Gardner, supra,* 150 *N.J.* at 375, 696 *A.*2d 599. While the trial judge properly ruled that the evidence was sufficient to withstand defendant's motion for a directed verdict on the issue of proximate cause, the judge nonetheless erroneously concluded that *Scafidi* did not apply, and charged the jury on proximate cause as follows:

> By proximate cause it is meant that the negligence of the Defendant was an efficient cause of the incident. That is a cause which necessarily set the other causes in motion, *or* was a substantial factor in bringing the incident about.
>
> It is defined as a cause which naturally and probably led to and might have been expected to produce the injury complained of.
>
> [Emphasis added.]

*See Model Jury Charge (Civil),* 7.10, "Proximate Cause—General Definition (pre–1984)," (1984); *compare Model Jury Charge (Civil),* 5.36E, "Medical Malpractice, Pre-existing Condition—Increased Risk/Loss of Chance—Proximate Cause" (1996). We are aware that the jury instruction given here varies from the language in the model charge in that the word "or," as underlined above, replaced the word "and," used in the model charge. While this ameliorated the error to some degree, it was not sufficiently instructive.

The "increased risk/substantial factor" standard was applicable to the present case. On retrial, this standard should be charged. The judge must, however, modify the model charge to clarify that

the court is not declaring that a preexisting condition existed, but is only providing the jury with the standard to apply if it did find that such a preexisting condition existed.

Defendant claims that there was no testimony to support plaintiffs survival action as there was no testimony to support any damage award, and the jury verdict form incorrectly listed "disability and impairment" and "loss of enjoyment of life" as among the items for which damages could be assessed.

*N.J.S.A.* 2A:15–3, pertaining to survival actions, provides:

> Executors and administrators may have an action for any trespass done to the person or property, real or personal, of their testator or intestate against the trespasser, and recover their damages as their testator or intestate would have had if he was living.

> In those actions based upon the wrongful act, neglect, or default of another, where death resulted from injuries for which the deceased would have had a cause of action if he had lived, the executor or administrator may recover all reasonable funeral and burial expenses in addition to damages accrued during the lifetime of the deceased.

In *Eyoma v. Falco*, 247 *N.J.Super.* 435, 589 *A.2d* 653 (App.Div. 1991), a wrongful death and survival action involving a patient who was comatose for over one year before he died, we wrote that the types of damages available in an action brought under that statute clearly include: (1) loss of earning capacity; (2) out-of-pocket expenses; and (3) pain and suffering. *Id.* at 439, 446, 589 *A.2d* 653. In addition, we noted that damages could be awarded for "disability and impairment" which "compensate for interruption of function which diminishes the individual's capacity for physical and mental activity." *Id.* at 451, 589 *A.2d* 653. Further, we held that damages for "loss of enjoyment of life may be awarded as part of damages for the total disability and impairment which exists when tortious injury causes one to be in a comatose or vegative state." *Id.* at 453, 589 *A.2d* 653.

Defendant first contends that there was no testimony that supported the jury's award of survival damages. We disagree. The record contains sufficient evidence that Andres suffered pain and discomfort and that there was some loss of enjoyment of life

as a result of defendant's malpractice. Andres ate very little and drank less than usual, and suffered from a 102 degree fever. He also had a cough, which developed on Sunday or Monday, cried frequently, and vomited after drinking from his bottle. He slept in an agitated state and was breathing hard as he slept. These symptoms continued through Wednesday, until Andres began coughing repeatedly and choking. Additionally, an expert testified as to the type of sensation that a person would feel if they had aspirated something small enough to go into the glottis and irritate the vocal chords. He described a feeling that would be both the sense of air being cut off, coupled with the direct irritation on the vocal chords that is a "sort of desperate kind of maneuver to cough this up" like "the feeling we feel when we inhale a little bit of water." All of these descriptions would enable the jury to understand the kind of suffering Andres was experiencing and thereby support a damage award.

Defendant asserts that the jury verdict form improperly caused the jury to consider "disability and impairment" and "loss of enjoyment of life" as items separate from pain and suffering. Defendant further argues that "loss of enjoyment of life" damages are only available in cases of permanent injury. The jury verdict form asked: "What amount of damages do you award to plaintiffs for the pain and suffering, the disability and impairment and loss of enjoyment of life suffered by their son until his death?" Defense counsel objected at trial to the "use of the words 'disability and impairment'" on the jury verdict form, stating that these were not part of "the survival portion."

In *Eyoma*, we discussed compensation for the damages actually suffered by someone in a coma or other state where pain and suffering damages were *not consciously* perceived by the injured person. *Eyoma, supra*, 247 *N.J.Super.* at 451, 589 *A.*2d 653. We noted that conscious perception is not needed for disability and impairment damages, because such damages "compensate for interruption of function which diminishes the individual's capacity for physical and mental activity." *Ibid.* (quoting *Reale v. Town-*

*ship of Wayne,* 132 *N.J.Super.* 100, 114, 332 *A.2d* 236 (Law Div.1975)). It was tacitly understood in our discussion in *Eyoma* that if there was no coma or inability to perceive, such damages were proper. The question in *Eyoma* was whether the fact that plaintiff was in a coma precluded such a damage award.

Here, unquestionably, damages may be awarded for Andres' diminished ability to carry on his usual physical and mental activity. There was testimony that Andres' was in distress and that his abilities to eat, drink and play were curtailed. Because these are the major life activities of a child his age, we are satisfied that disability and impairment damages were appropriately charged and considered by the jury.

There is no basis for defendant's argument that such damages turn on the permanency of the injuries. In fact, even if a person were in a coma for only a short period of time and then recovered, our holding in *Eyoma, supra,* would support recovery by that person for damages that "compensate for interruption of function which diminishes the individual's capacity for physical and mental activity" during the period of the coma.

## II

Plaintiffs contend that the trial judge erred by dismissing the wrongful death claim. Plaintiffs contend that the trial court misapplied the law in determining that they had presented insufficient proofs to allow the jury to determine the plaintiffs' losses under a wrongful death theory. We agree.

New Jersey's wrongful death act, *N.J.S.A.* 2A:31–1 to –6, permits for the recovery of damages under the following provision:

In every action brought under the provisions of this chapter the jury may give such damages as they shall deem fair and just with reference to the pecuniary injuries resulting from such death, together with the hospital, medical and funeral expenses incurred for the deceased, to the persons entitled to any intestate personal property of the decedent.

[*N.J.S.A.* 2A:31–5.]

The extent of "pecuniary injuries" for which a parent could recover upon the death of a child were addressed in *Green v. Bittner*, 85 *N.J.* 1, 424 *A.*2d 210 (1980). In *Green*, which involved a high school senior killed in an automobile accident, the Court reversed a jury award of zero damages for pecuniary losses, finding such a verdict to be a miscarriage of justice. *Green, supra*, 85 *N.J.* at 4, 424 *A.*2d 210. The Court held that when parents sue for the wrongful death of their child, damages should not be limited to such factors as the value of helping with household chores or anticipated future financial contributions to the household; rather, "the jury should be allowed, under appropriate circumstances, to award damages for the parents' loss of their child's companionship as they grow older, when it may be most needed and valuable, as well as the advice and guidance that often accompanies it." *Ibid.* The Court noted:

[g]iven this expansion of permissible recovery, a verdict finding no damages for the death of a child should ordinarily be set aside by the trial court and a new trial ordered. To sustain such a verdict "would result in a return to the outmoded doctrine that a child is a liability—not an asset."

[*Ibid.* (citing *Bohrman v. Pennsylvania Railroad Co.*, 23 *N.J.Super.* 399, 409, 93 *A.*2d 190 (App.Div.1952)).]

The *Green* Court stated that "courts have not hesitated to recognize the need of children for physical help and care. Parents facing age or deteriorating health have the same need, and it is usually their children who satisfy their need." *Green, supra*, 85 *N.J.* at 11, 424 *A.*2d 210. Therefore, the Court recognized as recoverable the pecuniary value of tending to those needs through hiring housekeeping, errand-running, cooking and other home assistance professionals. *Id.* at 12, 424 *A.*2d 210. The pecuniary value of lost "guidance, advice and counsel" from the child as the parent ages was also allowed. *Id.* at 14, 424 *A.*2d 210.

Of the proof needed to award such damages given the unknown course of the child's life, the Court wrote:

Given the speculative quality of the inferences, it might further be questioned whether one could realistically attach an estimated pecuniary value to such services. Our answer is, *even assuming no special circumstances are proven, that the nature of these cases has led our courts to allow damages even though the*

*inferences, and the estimate of damages, are based on uncertainties.* When a parent dies and loss of advice, guidance and counsel is allowed to the surviving children, and when an infant child dies and loss of prospective services is allowed to the parents, *the proof that suffices is the parent-child relationship and what we assume the jury can conclude from that relationship alone.*

[*Id.* at 15, 424 *A.*2d 210 (citations omitted; emphasis added).]

Even where a child is only five months old, the Court stated that damages are allowed without any showing that the child "was likely to render services around the house." *Id.* at 15, 424 *A.*2d 210 (citing *Greenberg v. Stanley,* 51 *N.J.Super.* 90, 108–09, 143 *A.*2d 588 (App.Div.1958), *aff'd in relevant part,* 30 *N.J.* 485, 492, 153 *A.*2d 833 (1959)). The Court added:

Given a normal parent-child relationship, a jury could very well find it is sufficiently probable, had the child lived, that at some point he or she would have rendered the kind of companionship services mentioned herein and, although perhaps even somewhat more conjectural, the kind of advice, guidance and counsel we have described. It will be up to the jury to decide what services would have been rendered, and what their value is, subject to no more or no less control, direction, and guidance from the court than occurs in other wrongful death cases. There need be no showing that companionship and advice will probably be purchased by the parent because of the child's death; it is sufficient that the deceased would have rendered them.

[*Green, supra,* 85 *N.J.* at 16–17, 424 *A.*2d 210.]

A motion for dismissal at the close of plaintiff's case "shall be denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." *R.* 4:37–2(b). The plaintiff must be afforded the benefit of all of the evidence presented plus the reasonable inferences which it supports; and, if "reasonable minds could differ, the motion must be denied." *Geldreich v. American Cyanamid Co.,* 299 *N.J.Super.* 478, 489, 691 *A.*2d 423 (App.Div.1997) (quoting *Dolson v. Anastasia, supra,* 55 *N.J.* at 5, 258 *A.*2d 706).

In *Carey v. Lovett, supra,* the Supreme Court reversed a jury verdict of $450,000 in damages for the wrongful death of a ten-day-old baby. 132 *N.J.* 44, 67, 622 *A.*2d 1279 (1993). In that case, the Court wrote:

The problem inherent in evaluating the economic value of a newborn's life is obvious. No one can know much, if anything, about the infant and his or her future economic worth. That difficulty, however, should not preclude any award.

Some award is appropriate "even though the inferences, and estimate of damages, are based on uncertainties."

[*Id.* at 68, 622 *A.*2d 1279 (quoting *Green, supra,* 85 *N.J.* at 15, 424 *A.*2d 210).]

The *Carey* Court noted that as to the proofs, the plaintiffs "demonstrated that their family was close, each member supporting the others in various ways. The record is otherwise understandably silent about the infant's potential economic worth. Such slender proof cannot support so generous a verdict, even in this sad case." *Carey, supra,* 132 *N.J.* at 68, 622 *A.*2d 1279. Significantly, the Court did not indicate that the "slender proof" in that case would prohibit *any* award, only that it precluded an award as generous as $450,000 for the loss.

In the present case, plaintiffs' damages for Andres' wrongful death could be founded on the evidence that Andres was Maria and Roberto's oldest child; based on the ages given at trial, the other two children were born after Andres' death. There was also evidence that both Maria and Roberto had come to the United States from foreign countries, and that both had been employed in blue-collar type jobs. From these facts, a jury could have inferred that Andres' financial contributions to the household as well as companionship and assistance would have been forthcoming as the parents aged, particularly because the Arenas' were unlikely to amass significant savings working at their jobs. The family might also have benefitted from the guidance, advice and counsel, and language skills of their American-born and educated child, as well as in matters of American culture. Additionally, the family might have yielded pecuniary benefit from their child's assistance in avoiding language problems, especially for Maria, who had to use an interpreter at trial.

Given these inferences, reasonable minds could conclude that plaintiff had established the likelihood of pecuniary loss due to the wrongful death of their son. This is particularly so given the necessarily speculative nature of proving the pecuniary losses resulting from a child's death as recognized in *Green, supra.* The model jury charge on wrongful death of a minor provides guidance to the jury in awarding proper damages for an infant's death.

*Model Jury Charge (Civil)*, 6.16, "Wrongful Death," (1984). Therefore, it was error to have dismissed plaintiffs' wrongful death claim. Reasonable persons could have found sufficient evidence in the record from which to assess plaintiffs' pecuniary losses attributable to Andres' death.

Plaintiffs contend that the trial court erred by dismissing Maria's claim for emotional distress. We disagree.

In *Frame v. Kothari*, 115 *N.J.* 638, 560 *A.*2d 675 (1989), we reversed a jury's verdict for emotional distress following a child's death from a medical misdiagnosis, and the Supreme Court affirmed the reversal. *Id.* at 640, 560 *A.*2d 675. The Supreme Court reviewed the extension of recovery for emotional distress under *Portee v. Jaffee*, 84 *N.J.* 88, 101, 417 *A.*2d 521 (1980), to persons who were not physically injured but who could prove: "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." *Frame, supra*, 115 *N.J.* at 643, 560 *A.*2d 675 (quoting *Portee, supra*, 84 *N.J.* at 101, 417 *A.*2d 521). The *Frame* Court noted that the discovery of a family member's death would always "threaten one's emotional welfare" but that recovery would arise only where there is "negligent conduct that strikes at the plaintiff's basic emotional security," such as the "traumatic sense of loss" that an accident witness would experience. *Id.* at 643, 560 *A.*2d 675.

The *Frame* Court reviewed numerous cases from other jurisdictions where emotional distress damages were denied in cases involving medical misdiagnosis, noting that

> the common thread running through these cases is that a misdiagnosis normally does not create the kind of horrifying scene that is a prerequisite for recovery. *Rarely will a member of the patient's family contemporaneously observe the immediate consequences of the defendant's misdiagnosis,* and even more rarely will the results of the misdiagnosis be the injury or death of a loved one contemplated by the gruesome scene portrayed in *Portee.*

> [*Frame, supra*, 115 *N.J.* at 647–48, 560 *A.*2d 675 (emphasis added).]

The Court held that in an appropriate case, recovery for emotional distress for medical misdiagnosis might be available "if a family member witnesses the physician's malpractice, observes the effect of the malpractice on the patient, and immediately connects the malpractice with the injury" because "[s]uch an event could be shocking." *Id.* at 649, 560 *A*.2d 675.

In the present case, as in *Frame*, there was no immediate traumatic scene connected with the misdiagnosis. The defendant's diagnosis occurred four days before Andres' death, and there was no showing that upon the misdiagnosis Maria "observe[d] the effect of the malpractice on the patient, and immediately connect[ed] the malpractice with the injury."

Here, there was an even greater lapse of time between the misdiagnosis and the death than in *Frame*. In *Frame*, the Court noted that the parents were present during the misdiagnosis, but that the diagnosis did not manifest itself in an *immediate* injury. *Id.* at 650, 560 *A*.2d 675. Four hours passed before the parents found their son "in a moribund condition" and eleven hours later they received a call from the hospital that he had died. *Ibid.* The court found that "[t]he chain of circumstances, although deeply tragic, were not 'shocking.' In a sense, their situation was like that of parents who witnessed the pain and suffering of their child due to illness or injury without awareness that a medical misdiagnosis was contributing to their child's continued pain and suffering." *Ibid.*

We recognize that the horror of a mother witnessing the choking of her infant child is a factor not present in *Frame*. However, we find the time lapse between that incident and the misdiagnosis to be a sufficient basis for denying emotional distress damages. *Cf. Greene v. Memorial Hosp. of Burlington County,* 299 *N.J.Super.* 372, 691 *A*.2d 369 (App.Div.), *certif. granted and cause remanded,* 151 *N.J.* 67, 697 *A*.2d 542, *remanded for new trial,* 304 *N.J.Super.* 416, 701 *A*.2d 437 (App.Div.1997) (mother viewed her daughter's "horrifying seizure" that she immediately attributed to the doctor's continuing inaction in the hospital emer-

gency room). The trial judge correctly ruled that the evidence did not give rise to an emotional distress claim.

We reverse and remand for a new trial on all issues, to include plaintiffs' claim for wrongful death damages previously dismissed by the Law Division.